STATE OF CONNECTICUT *v.* RICHARD PATTERSON
(14299)

CALLAHAN, BORDEN, BERDON, KATZ and PALMER, Js.

Argued June 10, 1993—decision released May 3, 1994

· *William Holden,* public defender, with whom, on the brief, were *Barry A. Butler,* assistant public defender, and *Michael A. Heran,* certified legal intern, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert Lacobelle,* assistant state's attorney, for the appellee (state).

PALMER, J. The defendant, Richard Patterson, was convicted, after a trial to a three judge court, of murder in violation of General Statutes § 53a-54a (a).[1] The defendant appealed[2] from the judgment of conviction claiming that: (1) the state failed to prove the element of intent beyond a reasonable doubt; and (2) the evidence presented by the defendant established, as a matter of law, the affirmative defenses of insanity[3] and,

---

[1] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person."

[2] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[3] General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

"(b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation

in the alternative, extreme emotional disturbance. After hearing oral argument, we remanded the case to the three judge court for an articulation of the facts underlying its determination that the defendant had committed the crime of murder.[4] *State* v. *Patterson,* 227 Conn. 448, 629 A.2d 1133 (1993). The articulation rendered by the court pursuant to our remand sets forth its factual findings and explains its reasons for rejecting the defendant's affirmative defenses. Because the factual findings of the three judge court are supported by the evidence, we affirm the judgment of conviction.

The court stated that it had found the following facts. On October 21, 1988, at approximately 9 p.m., Desmond Clark entered a variety store on Stratford Avenue in Bridgeport. Clark saw an acquaintance, Nesbourne Wright, in the store, and asked him for a ride home. Wright agreed, and the two men left the store and proceeded toward Wright's car. On their way to the car, they were approached by the defendant, a distant cousin of Clark's, who also requested a ride from Wright. Wright agreed to give the defendant a ride as well. As Wright and his two passengers walked to Wright's car, the defendant stated that three men had sexually assaulted his girlfriend. Wright responded that he did not know what the defendant was talking about. When they arrived at the car, the defendant sat in the front passenger seat and Clark sat in the rear, behind the driver, Wright.

or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a licensed practitioner, as defined in section 20-184a, and was used in accordance with the directions of such prescription."

[4] Practice Book § 4061 provides in relevant part: "If the court deems it necessary to the proper disposition of the cause, it may remand the case for further articulation of the basis of the trial court's factual findings or decision."

Wright drove directly to the defendant's house and double-parked on the street in front. The defendant, however, requested that Wright "take Clark home first." When Wright indicated that he was "not coming back this way," both Clark and the defendant exited the car. Immediately thereafter, Clark heard several gunshots from the direction of the car and, frightened, ran to the house of a relative that was located next door to the defendant's residence. As Clark fled, he observed the defendant running in the direction of his own house with a gun in his hand.[5]

The Bridgeport police were called to the scene, where they found Wright slumped over in the driver's seat of the car, bleeding profusely from a wound to the head. Wright died shortly thereafter. An autopsy revealed that the cause of death was a bullet fired at close range to Wright's right temple.[6] That bullet was extracted from Wright's head during the autopsy. A second bullet was removed from the dashboard of Wright's car by the police.

On October 24, 1988, police officers executed a search warrant at the defendant's apartment and found two handguns, including a .38 caliber revolver wrapped in an old pair of pants, hidden beneath the turntable of a stereo set in the defendant's bedroom. A forensic firearms examiner determined that both the bullet recovered from Wright's head and the bullet recovered from his car had been fired from the .38 caliber revolver discovered in the defendant's bedroom.

The defendant presented the testimony of several expert witnesses and family members in support of his

---

[5] Clark testified that he had not known that the defendant had been in possession of a handgun until he observed the defendant running from the car after the shooting.

[6] Kurt Nolte, the pathologist who had performed the autopsy on Wright, estimated that the bullet had been fired from a distance of between one inch and four feet from Wright's head.

affirmative defenses of insanity and extreme emotional disturbance. The court rejected those defenses, however, and unanimously found the defendant guilty of the crime of murder. The defendant has appealed from the judgment of the court sentencing him to a term of imprisonment of forty-five years to be suspended after the expiration of thirty-five years.

## I

The defendant first claims that the state failed to prove beyond a reasonable doubt that he shot the victim with the intent to kill him. We disagree.

Upon appellate review of a claim of evidentiary insufficiency, "[w]e first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court. . . . We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court . . . could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . ." (Internal quotation marks omitted.) *State* v. *Rasmussen,* 225 Conn. 55, 73–74, 621 A.2d 728 (1993); *State* v. *Lewis,* 220 Conn. 602, 606, 600 A.2d 1330 (1991). "That the [trier of fact] might have drawn other possible inferences from [the evidence] is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt." (Internal quotation marks omitted.) *State* v. *Medina,* 228 Conn. 281, 304, 636 A.2d 351 (1994); *State* v. *Sinclair,* 197 Conn. 574, 578, 500 A.2d 539 (1985).

In order to establish that the defendant had the requisite intent to commit murder, the state bears the burden of proving, beyond a reasonable doubt, that the defendant caused the death of another with the conscious objective to do so. General Statutes §§ 53a-3 (11)

and 53a-54a. That the defendant acted with the specific intent to kill may be proven solely by circumstantial evidence, as long as that evidence establishes beyond a reasonable doubt that the defendant had the conscious objective to take the life of another. *State* v. *Rasmussen,* supra, 225 Conn. 74; *State* v. *Zdanis,* 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). The defendant's intent to kill, therefore, may be inferred from evidence of the defendant's use of a deadly weapon, the manner in which the weapon was used, and the nature and number of wounds inflicted. *State* v. *Medina,* supra, 228 Conn. 303–304; *State* v. *Rasmussen,* supra, 74. "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *Medina,* supra, 303; *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917 (1973).

The evidence introduced at trial supported the facts found by the trial court and its determination that the defendant had intentionally killed the victim. The state presented testimony from which the court concluded that the defendant had fatally shot the victim in the head from close range with a .38 caliber revolver. There was also testimony that the defendant had asked the victim to take Clark home first, evidence from which the court could reasonably have inferred that the defendant had sought to exclude Clark as a possible witness to the shooting. In addition, the evidence supported the court's findings that the defendant had: (1) intentionally concealed a revolver on his person prior to using it to shoot the victim; (2) fled from the scene immediately after fatally wounding the victim; (3) hidden the murder weapon subsequent to the shooting to avoid its detection by the authorities; and (4) left his residence and the city of Bridgeport for several days

after the fatal encounter. Furthermore, the court expressly found that the defendant's concealment of the murder weapon and his flight after the shooting reflected a consciousness of guilt. We conclude, therefore, that the evidence was sufficient to permit the three judge court to have found beyond a reasonable doubt that the defendant had intended to kill the victim.

## II

The defendant also claims that the evidence he introduced at trial established, as a matter of law, his affirmative defenses of insanity and, in the alternative, extreme emotional disturbance.[7] We conclude that because the court's rejection of the defendant's affirmative defenses is reasonably supported by the evidence, his claim must fail.

In support of his affirmative defenses, the defendant presented the testimony of three psychiatrists and a clinical psychologist, as well as several family members who described the defendant's bizarre behavior and his mental and physical deterioration in the two years prior to the fatal shooting. Joseph More, a psychiatrist at the Whiting Forensic Institute (Whiting),[8] testified that the defendant suffered from chronic paranoid schizophrenia and that his beliefs were, at times, illogical, irrational and delusional. More further testified that the defendant had suffered from this illness for at least one year prior to the shooting, and that his mental condition was not the result of drug abuse. Ann Hoefer, a psychiatrist who had been retained by the state, agreed that the defendant suffered from chronic paranoid schizophrenia, that he had suffered from the illness for a considerable period of time prior to the

[7] General Statutes § 53a-12 (b) provides: "When a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

[8] The defendant was hospitalized at Whiting from March 2, 1989, until August 1, 1989.

shooting, and that he had experienced hallucinations and delusions that resulted in the development of a belief system that bore little or no relationship to reality. Hoefer stated that on the day of the shooting, the defendant had experienced a hallucination in which two men had restrained the defendant's girlfriend while the victim had sexually assaulted her, and that this hallucination had compelled the defendant to kill the victim.

A third psychiatrist, Jeremy August, corroborated the diagnoses of More and Hoefer that the defendant had suffered from paranoid schizophrenia and that his bizarre and unusual behavior had been the result of delusional thinking and auditory hallucinations caused by his mental illness. August also testified that the defendant had told him that he had killed the victim because it had been God's will that he do so.

Charles Opsahl, a clinical psychologist, testified that he had conducted certain psychological tests on the defendant and that, on the basis of those tests, he had concluded that the defendant was psychotic. Opsahl also opined that the defendant's illness made it difficult for him to distinguish between fantasy and reality, and that his disturbed thought patterns were the result of his psychosis.

Finally, several of the defendant's family members, including his mother and sister, testified that his mental health had deteriorated markedly and progressively over the two year period prior to the shooting. Each of these witnesses testified concerning the defendant's strange and apparently irrational behavior, and recited specific incidents of such conduct. Other relatives testified that during the two years prior to the shooting, the defendant had heard inner voices speaking to him, had walked naked through the streets of Jamaica during a visit there, had searched through his neighbor's garbage, had talked and chanted to himself, often recit-

ing passages from the bible, had made bizarre and fantastic claims about his past, had maintained an unkempt appearance and failed to attend to matters of personal hygiene, had refused to leave his home for long periods of time, and had claimed to be the Messiah.

The evidence offered by the state in derogation of the defendant's affirmative defenses consisted of the cross-examination of the defendant's witnesses and testimony from two rebuttal witnesses, a Bridgeport police detective and a psychiatric nurse, along with certain documentary evidence. On cross-examination, family members of the defendant conceded that he was not a violent person, that he had been able to change certain behavior patterns when requested to do so, that he had received a promotion at his place of employment, and that he had exhibited no unusual conduct on the day of the shooting.

On cross-examination, More testified that he recalled no aggressive or violent behavior by the defendant during his six month hospitalization at Whiting. More also acknowledged that, during the defendant's hospitalization, he had been at all times properly oriented as to time and place, that he had admitted the wrongfulness of his conduct, that he had been able to follow instructions and to conform his conduct to the rules and regulations of the institution, that he had participated in special activities at the hospital, serving as his unit's representative on the editorial committee of the patient newspaper and assisting in the planning of a charity fundraiser, and that he had interacted appropriately with other patients. More acknowledged that a person suffering from schizophrenia is not necessarily unable to distinguish between right and wrong, and he conceded that he could only conjecture as to the defendant's mental condition at the time of the shooting. He also noted that the defendant had been diagnosed as a cannabis abuser, and that such abuse may trigger or

aggravate a psychotic episode. Finally, More testified that the defendant had regularly advised fellow patients on how to manipulate and deceive the staff at Whiting.

On cross-examination, Hoefer agreed that persons suffering from schizophrenia can frequently understand the difference between right and wrong and that they are often able to conform their conduct accordingly. She also acknowledged that the defendant had a long-standing cannabis habit, that he smoked five to ten marijuana cigarettes daily, that he had smoked marijuana on the day of the shooting, and that the use of that drug can aggravate a psychotic episode. Hoefer further testified that she had not had sufficient time to review the entire medical record of the defendant's hospitalization at Whiting. The third psychiatrist, August, concurred that not all persons suffering from chronic paranoid schizophrenia are unable to distinguish between right and wrong, and that such persons are sometimes able to conduct themselves appropriately. August noted that he had found no documentation of any unusual behavior by the defendant while the defendant had been incarcerated at the Bridgeport correctional center from October 24, 1988, until his confinement at Whiting in March, 1989. August also acknowledged that he had been unaware both that the defendant had concealed the .38 caliber revolver prior to shooting the victim and that the police had found two weapons at the defendant's residence. He testified that those facts could suggest that the shooting was premeditated and that the defendant had been able to appreciate the wrongfulness of his conduct. Finally, August indicated that the defendant's mother had told him that the defendant had suffered memory lapses after he smoked marijuana.

The state's rebuttal case consisted of testimony from Detective James Uliano of the Bridgeport police department and Sueanne O'Brien, a psychiatric nurse at the

Bridgeport correctional center, as well as certain records relating to the defendant's incarceration at the Bridgeport correctional center. Uliano testified that he had been informed by the defendant's mother that the defendant became "crazy" when he smoked marijuana. O'Brien identified several documents from the Bridgeport correctional center, including a psychiatric evaluation of the defendant that noted that he had twice denied any psychiatric complaints or problems, and a report indicating that the defendant had claimed to be a Rastafarian.

The three judge court acknowledged that the defendant's behavior prior to October 21, 1988, "could be considered unusual, strange, and even antisocial." The court concluded, however, that most of the conduct attributed to the defendant by his family members appeared to be a manifestation of his religious beliefs. The court also found that the defendant had not revealed that he had heard inner voices until after the shooting, that he had not exhibited any bizarre or unusual behavior on the day of the shooting, that he was capable of conforming his conduct to the requests of family members, and that his advice to other patients at Whiting on how to "fool" the staff revealed a calculating and manipulative personality.

The court, moreover, expressly discounted the testimony of the defendant's experts, noting that their diagnoses were based on the generally self-serving interview statements of the defendant and his family members. In the court's view, those experts had failed adequately to account for the defendant's apparently premeditated attack on the victim, his efforts thereafter to avoid detection and apprehension, and his equally calculated attempts to manipulate the diagnostic staff at Whiting. The court also noted that the defendant's experts had agreed that persons suffering from paranoid schizophrenia are not necessarily una-

ble to distinguish between right and wrong, and that the expert testimony had failed to demonstrate that the defendant, at the time of the fatal shooting, had been unable to do so. On the basis of these findings, the court rejected the defendant's affirmative defenses, concluding that the defendant had failed to establish by a preponderance of the evidence that, at the time of the shooting, he had lacked substantial capacity, due to a mental disease or defect, either to appreciate the wrongfulness of his conduct or to conform his conduct as required by law, or that, in the alternative, he had acted under the influence of an extreme emotional disturbance.

"[W]e have repeatedly stated that our review of the conclusions of the trier of fact, whether it be a judge, a panel of judges or a jury, is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. . . . In its consideration of the testimony of an expert witness, the trial court might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them." (Citations omitted; internal quotation marks omitted.) *State* v. *Steiger*, 218 Conn. 349, 378–79, 590 A.2d 408 (1991); see also *State* v. *Medina*, supra, 228 Conn. 309; *State* v. *Perez*, 182 Conn. 603, 610, 438 A.2d 1149 (1981).

The three judge court heard and evaluated conflicting evidence concerning the defendant's sanity at the

time of the shooting. Although the defendant's witnesses testified that the defendant had suffered from a mental illness that had caused him to behave in a strange and eccentric manner in the months leading up to the shooting, concessions elicited from those same witnesses upon vigorous cross-examination by the assistant state's attorney, together with the evidence introduced by the state, raised substantial questions regarding the observations and conclusions of the defendant's witnesses. Furthermore, "[b]ecause the trier of fact can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions"; *State* v. *Steiger,* supra, 218 Conn. 381; the fact that expert witnesses testified on behalf of the defendant and the fact that the state called none do not establish that the court could not reasonably have found that the defendant failed to prove insanity by a preponderance of the evidence. *State* v. *Medina,* supra, 228 Conn. 309–10; *State* v. *Perez,* supra, 182 Conn. 608–10. We will not, moreover, substitute our judgment for that of the fact finder with respect to the weight to be given the testimony of the expert and lay witnesses on the issue of the defendant's sanity. Because the evidence reasonably supported the determination of the court that the defendant had not established his affirmative defense of insanity by a preponderance of the evidence, he was not entitled to a judgment of acquittal as a matter of law.

The defendant has similarly failed to demonstrate that the evidence required the court to accept his alternative affirmative defense of extreme emotional disturbance. In order to prevail on that defense, the defendant bore the burden of proving, by a preponderance of the evidence, that he had committed the offense under the influence of an extreme emotional disturbance, and, that there was a reasonable explanation

or excuse for his extreme emotional disturbance.[9] In interpreting the meaning of the phrase "extreme emotional disturbance," we have stated that the trier of fact must be persuaded that: "(1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions." *State* v. *Forrest,* 216 Conn. 139, 147–48, 578 A.2d 1066 (1990); *State* v. *Elliott,* 177 Conn. 1, 9, 411 A.2d 3 (1979). These guidelines are "neither conclusive nor exclusive, however, for '[i]n the final analysis . . . the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by expert testimony of both sides, but left to its own factual determinations.' " *State* v. *Forrest,* supra, 148, quoting *State* v. *Zdanis,* supra, 182 Conn. 395.

There was evidence from which the three judge court could reasonably have determined that the defendant had planned his attack on the victim and that he had calmly and deliberately executed that plan. Moreover, the trial testimony indicated that the defendant had not exhibited any behavior on the day of the shooting to suggest that he had killed the victim in a fit of rage or passion, or under the influence of a similarly extreme emotion. Furthermore, the evidence permitted the

[9] "[T]he determination of the reasonableness of the explanation or excuse for the emotional disturbance must be measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be." *State* v. *Steiger,* supra, 218 Conn. 385; see also *State* v. *Ortiz,* 217 Conn. 648, 656–58, 588 A.2d 127 (1991).

court to find that the defendant had not killed the victim in the delusional belief that the victim had sexually assaulted the defendant's girlfriend, or that, even if the defendant had acted under such a delusion, he was not also acting under the influence of an extreme emotional disturbance. We conclude, therefore, that the evidence provided a sufficient basis for the three judge court to reject the defendant's affirmative defense of extreme emotional disturbance.

The judgment is affirmed.

In this opinion, CALLAHAN and BORDEN, Js., concurred.

BERDON, J., with whom KATZ, J., joins, concurring. I concur in the result.

The facts of this case vividly display the injustice that results from this court's recent decision that the state constitution can countenance the artificial compartmentalization of the issues of intent to commit a crime and the insanity of the defendant. *State* v. *Joyner,* 225 Conn. 450, 457, 625 A.2d 791 (1993) (upholding under the state constitution the placement of the burden to disprove sanity on the defendant by a preponderance of the evidence). As I pointed out in my dissent in *Joyner,* "[n]ot only does the insanity defense undermine the intent necessary to commit the crime, but sanity and intent are so interrelated that sanity necessarily becomes an element of the crime." Id., 486 (*Berdon, J.,* dissenting). I also quoted Justice Brennan's compelling reasoning in his dissent in *Rivera* v. *Delaware,* 429 U.S. 877, 880, 97 S. Ct. 226, 50 L. Ed. 2d 160 (1976): "Like the state rule invalidated in *Mullaney* [v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975)], which implied malice unless the accused negated it, the plea of insanity, whether or not the State chooses to characterize it as an affirmative defense,

relates to the accused's state of mind, an essential element of the crime, and bears upon the appropriate form of punishment. Nor is it sufficient after *Mullaney* to say, as the Court did in *Leland* [v. *Oregon*, 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952)], that a State may characterize the insanity defense as it chooses. [The United States Supreme Court] said in *Mullaney* that the requirement of [*In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970),] that the State prove all elements of the crime was one of substance, not limited to a State's definition of the elements of the crime . . . ." (Internal quotation marks omitted.) *State* v. *Joyner*, supra, 484 (*Berdon, J.*, dissenting). Accordingly, it is clear to me that like intent; *State* v. *Carpenter*, 214 Conn. 77, 82, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 181 (1992); the mental capacity of the person to commit the crime must be proven by the state beyond a reasonable doubt.

Of course, under a requirement that the state has the burden of proving the requisite mental capacity under General Statutes § 53a-13, the state could not prevail in the present case. As the majority points out, three psychiatrists testified at the defendant's trial—Joseph More from the state's Whiting Forensic Institute; Ann Hoefer, who had been retained by the state but whose opinion did not support the state; and Jeremy August. *All three* testified that the defendant suffered from chronic paranoid schizophrenia and that his beliefs were illogical, irrational and delusional. Although More did not address whether the defendant's insanity had compelled him to murder the victim, he did testify regarding his evaluation and treatment, including medication, of the defendant during the five month period that it took to restore his competency to stand trial. Both Hoefer and August testified that, in their clinical opinion, the defendant's hallucinations and delusional thinking caused him to kill the victim. For example, as the majority points out, it was Hoefer's clinical opinion that

"on the day of the shooting, the defendant had experienced a hallucination in which two men had restrained the defendant's girlfriend . . . while [the victim] sexually assaulted her, and that this hallucination had compelled the defendant to kill the victim." The state did not present the testimony of a single psychiatrist or psychologist to challenge those three witnesses, but relied on lay witnesses, skillful cross-examination and the fact that the defendant had the burden of proof on the issue.

As I pointed out in my dissent in *State* v. *Medina,* 228 Conn. 281, 334 n.15, 636 A.2d 351 (1994), "[m]ental health issues in regard to the criminal law have not fared well" in the recent past. See *State* v. *Stanley,* 223 Conn. 674, 689, 613 A.2d 788 (1992) (refusal to review under state constitution whether state is required to prove beyond a reasonable doubt that the defendant's confession was voluntary); *State* v. *Raguseo,* 225 Conn. 114, 126–28, 622 A.2d 519 (1993) (defense of extreme emotional disturbance is determined from the viewpoint of a "reasonable" person in the defendant's situation); *State* v. *Joyner,* supra, 225 Conn. 472; *State* v. *Medina,* supra, 296 (refusal to reach issue under state constitution of whether to admit incriminating statements made while the defendant was mentally ill). Today's decision demonstrates for all practical purposes the irrelevance of the defendant's mental capacity to commit the crime, because the defendant has been held responsible and punished on the basis of evidence that clearly raises reasonable doubt as to his sanity at the time of the commission of the crime.

Because I must accept the majority opinion in *Joyner* as our current law, and since the defendant does not in the present case seek to revisit that four to one decision, I am compelled to concur in the result. Nevertheless, it is absolutely clear to me that, under the facts of this case, Mr. Patterson should not have been found

guilty and sentenced to a term of forty-five years in prison. Rather, he should have been hospitalized in order to receive treatment for his mental illness. Justice Zephaniah Swift wrote more than one hundred fifty years ago that "it is the reason of man that makes him accountable for his actions, and where there is no reason there is no crime . . . ." 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 361.