STATE OF CONNECTICUT *v.* OSCAR
MARTINEZ DEJESUS
(14921)

Peters, C. J., and Callahan, Berdon, Norcott and Palmer, Js.

Argued December 6, 1995—decision released March 5, 1996

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Jack W. Fischer*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Herbert E. Carlson, Jr.*, assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Oscar Martinez DeJesus, appeals[1] from the judgment of conviction of murder in violation of General Statutes § 53a-54a (a) and carrying a dangerous weapon in violation of General Statutes § 53-206 (a),[2] rendered following a trial to a three judge court. The defendant claims that: (1) the evidence was insufficient to prove beyond a reasonable doubt that he intended to kill the victim, Adeleida Ramos; (2) the evidence that he presented established his defense of insanity or, in the alternative, his defense of extreme emotional disturbance by a preponderance of the evidence; and (3) the burden imposed upon him to prove his insanity defense by a preponderance of the evidence pursuant to General Statutes § 53a-13 (a) violates the state constitution. We disagree and affirm the trial court's judgment.

The court could reasonably have found the following facts. On May 21, 1991, shortly after 6 p.m., the victim,

[1] The defendant appeals pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

General Statutes § 53-206 (a) provides in relevant part: "Any person who carries upon his person . . . any knife the edged portion of the blade of which is four inches or over in length . . . unless such person has been granted a written permit . . . shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . ."

the defendant's estranged girlfriend with whom he had fathered a daughter, went to the defendant's apartment, located at 2357 Main Street in Hartford, to pick up some groceries. She was accompanied by two of her children, Hiram and Orlando. Upon arrival at the defendant's apartment building, the victim rang the bell, notifying the defendant of her presence. The defendant permitted the victim entry into the building and she proceeded to his apartment, followed by Hiram. After the victim arrived at the defendant's floor, a fight broke out between the defendant and the victim on the stairway outside the defendant's door. During the altercation, the defendant repeatedly struck the victim.[3] The defendant then entered his apartment and returned with a bag of groceries, which he gave to the victim. The victim and Hiram then left the defendant's apartment building.

Once outside, the victim stopped to talk to a friend, while Hiram and Orlando played ball with a neighborhood child. When the victim finished conversing with her friend, she returned to the defendant's apartment building and again rang the door bell. This time, however, the defendant did not permit the victim entry into his building. Instead, he opened a window and asked why she had rung the bell again. At this point a brief exchange of unpleasantries occurred, during which the defendant called the victim a "bitch" and she referred to him as a "cabron."[4] The defendant thereafter placed two 911 phone calls to the Hartford police department, asking to speak with Officer Juan Morales.[5] Upon being

[3] At trial, Hiram testified that when he arrived at the apartment, he had seen the defendant beating the victim.

[4] According to the defendant's brief, the word "cabron" does not lend itself to a direct English translation, but is used as a derogatory term for a man who is made a fool of by a woman, akin to a cuckold.

[5] On May 20, 1991, in response to the defendant's having gone to the police station complaining that the victim had been bothering him, Morales had accompanied the victim to the defendant's apartment to enable her to retrieve some of her belongings that she had left there.

told that Morales was unavailable, the defendant informed the dispatcher and a police officer that he needed the police to intervene because the victim was bothering him and he did not want to harm her. The officer told him that the police would respond to his complaint.

Rather than wait for the police, however, the defendant armed himself with a machete and went in search of the victim. The victim was still in the area when the defendant left the building. Upon locating the victim, the defendant walked directly toward her with the grip of the machete in his hand and the blade up the back of his arm so as to conceal the weapon. Noticing the defendant coming toward her, the victim pleaded with the defendant not to strike her. The defendant ignored her pleas, however, and rained several vicious blows on the victim with the machete. After the attack, the defendant turned and started back toward his apartment.

When the victim pleaded for help, however, the defendant returned and renewed his attack. During this second assault, the defendant held the victim's head up by grasping her hair with his left hand while at the same time striking her in the neck with the machete several more times, killing her.[6] While attacking the victim, the defendant stated, "It's time for you to die." During the assault, Hector Alvardo, who witnessed the incident while driving past the area, exhorted the defendant to stop. The defendant, however, ignored Alvardo's entreaty, and asked, instead, whether because of his interference, Alvardo wanted the same thing to happen to him. After the defendant discontinued his second assault on the victim, he returned to his apartment.

Shortly thereafter, several police officers arrived at the scene to investigate the incident. From information

---

[6] An autopsy revealed that the victim had died from multiple incised wounds to her neck.

obtained from persons in the large crowd that had gathered, Sergeant Anthony Camilleri learned that the defendant was the assailant and that he had returned to his apartment building. To ensure that the defendant did not flee the area, Officer Daniel Albert proceeded to the rear of the defendant's building, while Camilleri stationed himself near the front door. As Albert was watching the rear exit, the defendant opened the back door, and, upon seeing Albert, immediately shut the door and bolted it. Shortly thereafter, the defendant exited the apartment building through the front door and walked directly toward Camilleri, shouting, "Take me, I did it; take me, I did it." The police officers then arrested the defendant. While being driven to police headquarters, the defendant, without being questioned, acknowledged that he had killed the victim with a machete.

In a substitute information, the state charged the defendant with one count of murder, one count of carrying a dangerous weapon and two counts of risk of injury to a minor, in violation of General Statutes (Rev. to 1991) § 53-21.[7] The trial court found the defendant guilty of murder and carrying a dangerous weapon, but acquitted him of both counts of risk of injury to a minor. Thereafter, the trial court sentenced the defendant to sixty years imprisonment on the murder conviction and three years on the conviction of carrying a dangerous weapon. The court ordered that the sentences run concurrently. This appeal followed.

I

The defendant first claims that the trial court improperly found him guilty of murder because the evidence

---

[7] General Statutes (Rev. to 1991) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be

was insufficient to prove beyond a reasonable doubt that he had the specific intent to cause the death of the victim.[8] We disagree.

"In reviewing [a] sufficiency [of the evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993). . . ." (Internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 223–24, 658 A.2d 571 (1995). Our "review is the same whether the trier is a judge, a panel of judges, or a jury." *State* v. *Perez*, 182 Conn. 603, 606, 438 A.2d 1149 (1981). Moreover, "[t]his court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . ." (Internal quotation marks omitted.) *State* v. *Patterson*, 229 Conn. 328, 339, 641 A.2d 123 (1994); see also *State* v. *Steiger*, 218 Conn. 349, 378–79, 590 A.2d 408 (1991).

In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. *State* v. *Sivri*, 231 Conn.

fined not more than five hundred dollars or imprisoned not more than ten years or both."

[8] It is difficult to understand the defendant's claim of lack of intent or to distinguish it from his defenses of insanity and extreme emotional disturbance. His claim appears to be that he was so justifiably aggravated by the victim that he could not control himself and therefore acted without a conscious intent to cause her death and that his state of mind, i.e., lack of intent, was reflected by his conduct.

115, 132–33, 646 A.2d 169 (1994). The trier may "draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . ." (Citations omitted; internal quotation marks omitted.) *Id. As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt; State* v. *Ford,* 230 Conn. 686, 693, 646 A.2d 147 (1994); *State* v. *Patterson,* supra, 229 Conn. 332; *State* v. *Little,* 194 Conn. 665, 671–72, 485 A.2d 913 (1984); nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. *State* v. *Sivri,* supra, 134. "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." *Id.*

"The specific intent to kill is an essential element of the crime of murder." *Id.,* 126. "In order to establish that the defendant had the requisite intent to commit murder, the state bears the burden of proving, beyond a reasonable doubt, that the defendant caused the death of another with the conscious objective to do so. General Statutes §§ 53a-3 (11) and 53a-54a. That the defendant acted with the specific intent to kill may be proven solely by circumstantial evidence, as long as that evidence establishes beyond a reasonable doubt that the defendant had the conscious objective to take the life of another. *State* v. *Rasmussen,* [225 Conn. 55, 74, 621 A.2d 728 (1993)]; *State* v. *Zdanis,* 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). The defendant's intent to kill, therefore, may be inferred from evidence of the defendant's use of a deadly weapon, the manner in which the weapon was used, and the nature and number of wounds inflicted. *State* v. *Medina,* [228 Conn. 281,

303–304, 636 A.2d 351 (1994); *State* v. *Rasmussen,* supra, 74. Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . *State* v. *Medina,* supra, 303; *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917 (1973)." (Internal quotation marks omitted.) *State* v. *Patterson,* supra, 229 Conn. 332–33.

The defendant asserts that "[u]nder the facts of this case, the *only* inference which can reasonably and logically be inferred from [his] conduct was that his free will and intent were overborne" and, therefore, the state failed to prove beyond a reasonable doubt that he intended to cause the victim's death. (Emphasis in original.) We conclude, however, that the evidence introduced at trial reasonably supports the trial court's determination that the defendant intentionally killed the victim. The state presented evidence from which the trial court reasonably could have found that the defendant had: (1) threatened to kill the victim in a conversation with the victim's mother three weeks prior to the victim's death; (2) stated to the victim in the course of attacking her that it was "time for [her] to die"; (3) threatened to inflict harm upon a witness who implored him to refrain from assaulting the victim; (4) used a machete in his attack; (5) attempted to hide the machete as he approached the victim; (6) attacked the victim and inflicted four or five blows, momentarily left the victim and then returned to strike the fatal blows calmly and methodically; (7) went back to his apartment after the attack and bolted the rear door to his building upon seeing a police officer; and (8) confessed to the police that he had killed the victim. Moreover, the court was not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent.

These facts reasonably support the trial court's conclusion that the defendant had the intent to cause the victim's death. *State* v. *Patterson,* supra, 229 Conn. 332.

"Having concluded that, from the circumstantial evidence and the reasonable inferences drawable therefrom, the [trial court] could have reasonably inferred an intent to kill, we assume that fact—an intent to kill held by the defendant—to be true for the purpose of the defendant's challenge based upon evidentiary insufficiency. Therefore, for that purpose the defendant's hypothesis of a different state of mind that is inconsistent with a conviction of murder, namely, [his will and intent were overborne], is only possible and not reasonable." *State* v. *Sivri*, supra, 231 Conn. 136. In sum, the evidence was such that the trial court reasonably could have found beyond a reasonable doubt that the defendant intended to cause the victim's death.

## II

The defendant also claims that, as a matter of law, the evidence he presented to the court established his affirmative defense of insanity or, in the alternative, extreme emotional disturbance by a preponderance of the evidence.[9] We disagree and conclude that the trial court reasonably could have rejected both affirmative defenses.

In support of his affirmative defenses, the defendant presented the testimony of Walter Borden, a forensic psychiatrist, and Julia Ramos Grenier, a clinical psychologist. Borden testified that the defendant suffered from psychotic depression that manifested itself in recurrent auditory hallucinations in which his slain brother and sister-in-law requested that he join them in death. Borden stated that the defendant indicated that he had experienced these hallucinations since 1980, the year in which the defendant had killed the couple.[10]

[9] General Statutes § 53a-12 (b) provides: "When a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

[10] In 1982, following a jury trial, the defendant was convicted of two counts of manslaughter in violation of General Statutes § 53a-55 (a), in connection

Additionally, Borden stated that the defendant had a borderline personality disorder, which he defined to mean "a very disturbed, confused person who has especially poor problems in dealing with behavioral controls." Borden also testified that when these two mental ailments combine, they tend to weaken one's ability to control his or her behavior. Grenier testified in similar fashion, noting that a battery of neuropsychological tests administered to the defendant indicated that he suffered from various mental diseases or defects that affected his ability to control his behavior.[11]

The state offered no expert witnesses on the subject of the defendant's mental condition or capacity, but extensively cross-examined Borden and Grenier. In the course of cross-examination, Borden testified that he had previously evaluated the defendant in 1982 in connection with the defendant's having been charged with murder in the deaths of his brother and sister-in-law. Borden acknowledged that a report that he had prepared at that time did not indicate that the defendant had ever experienced auditory or visual hallucinations. Borden also stated that he considered the defendant to be a chronic alcoholic, who, in addition to drinking substantial amounts of alcohol, used marijuana and cocaine regularly. Borden further stated that the defendant had told him that on the day of the murder, he had consumed eighteen beers, a substantial amount

with the death of his brother and sister-in-law, who had been residing with him. See State v. DeJesus, 194 Conn. 376, 481 A.2d 1277 (1984). The defendant had served only a portion of his sentence, however, and was on parole at the time of this incident.

[11] Grenier said that the defendant suffered from the following: organic mood syndrome, which is a depressive type of disorder that is related to brain impairment; organic anxiety syndrome; polysubstance abuse; and organic personality syndrome, explosive type, which means that once the defendant loses control, he is unable to regain such until he has vented the rage in some manner.

of gin and a marijuana cigarette.[12] Borden testified that this consumption of intoxicants contributes to one's inability to control oneself. On cross-examination, Grenier stated that although she believed that the defendant suffered from organic brain impairment, a magnetic resonance imaging test had failed to disclose any such impairment.[13]

The trial court expressly stated that it had extensively reviewed the testimony of the defendant's two expert witnesses and had determined that the defendant had not established, by a preponderance of the evidence, that he had lacked the substantial capacity, as a result of a mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. General Statutes § 53a-13 (a). The court also concluded that the defendant had failed to establish the defense of extreme emotional disturbance by a preponderance of the evidence.

"[W]e have repeatedly stated that our review of the conclusions of the trier of fact, whether it be a judge, a panel of judges or a jury, is limited. See, e.g., *State v. Brice*, 186 Conn. 449, 459, 442 A.2d 906 (1982); *State v. D'Antuono*, 186 Conn. 414, 421, 441 A.2d 846 (1982) . . . *State v. Perez*, supra, [182 Conn.] 606. This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . *State v.*

---

[12] The defendant does not claim that he lacked intent to cause the victim's death because of his intoxication.

[13] Grenier attempted to explain that the difference between her findings and the test results do not undermine her determination as to the defendant's brain impairment, and testified that it was her experience that the magnetic resonance imaging test does not detect the microscopic brain damage that her tests revealed.

*Evans,* [203 Conn. 212, 238, 523 A.2d 1306 (1987)]. The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. Id. In its consideration of the testimony of an expert witness, the trial court might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. *State* v. *Perez,* supra, 610. . . . *State* v. *Evans,* supra, 238–39." (Internal quotation marks omitted.) *State* v. *Steiger,* supra, 218 Conn. 378–79.

It is well settled that the trier of fact can disbelieve any or all of the evidence proffered concerning the defense of insanity, including expert testimony, and can construe such evidence in a manner different from the parties' assertions. *State* v. *Patterson,* supra, 229 Conn. 340; *State* v. *Evans,* supra, 203 Conn. 238–39; *State* v. *Smith,* 185 Conn. 63, 73–74, 441 A.2d 84 (1981). The fact, therefore, that both of the defendant's expert witnesses supported his claim of insanity while the state chose to call no expert witnesses, but rather principally relied on cross-examination of the defendant's expert witnesses, does not require a determination that the trier of fact reasonably could not have concluded that the defendant had failed to prove insanity by the required standard. See General Statutes §§ 53a-13 (a) and 53a-12 (b);[14] *State* v. *Patterson,* supra, 340; see *State* v. *Perez,* supra, 182 Conn. 608–10. To the contrary, the record provides ample support for the court's conclusion that

[14] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

See footnote 9 for the text of § 53a-12 (b).

the defendant had failed to establish, by a preponderance of the evidence, that he lacked the substantial capacity, as a result of a mental disease or defect, to control his conduct within the requirements of the law.[15] Consequently, the court could reasonably have concluded that the defendant had failed to satisfy his statutory obligation to prove insanity by a preponderance of the evidence. See General Statutes § 53a-13 (a).

The defendant similarly has failed to demonstrate that the trial court improperly rejected his alternate affirmative defense of extreme emotional disturbance. See General Statutes § 53a-54a (a).[16] For the defendant to have prevailed on this defense, he would have had to establish, by a preponderance of the evidence, that he had caused the death of the victim under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse "measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be." *State* v. *Steiger*, supra, 218 Conn. 385; *State* v. *Patterson*, supra, 229 Conn. 341; *State* v. *Raguseo*, 225 Conn. 114, 122, 622 A.2d 519 (1993); *State* v. *Ortiz*, 217 Conn. 648, 656–58, 588 A.2d 127 (1991). To sustain his burden of establishing extreme emotional disturbance by a preponderance of the evidence, the defendant must persuade the trier of fact that: " '(1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction

---

[15] For example, the defendant's threatening a witness who had requested that he cease striking the victim rather than attacking the witness reflects that he possessed the ability to control himself at the time of the incident. The defendant does not claim that he did not appreciate the wrongfulness of his conduct.

[16] See footnote 2.

to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions.'" *State* v. *Patterson*, supra, 341. We have repeatedly stated that "[i]n the final analysis, the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by the expert testimony of both sides, but left to its own factual determinations." (Internal quotation marks omitted.) *State* v. *Raguseo*, supra, 122; *State* v. *Steiger*, supra, 383.

In support of his defense of extreme emotional disturbance, the defendant offered testimony regarding the stormy relationship between himself and the victim. He established that they had had a child together and that as a result of the victim's arrest,[17] his child and another child of the victim had been placed in the care of the department of children and families. Borden testified that the placement of the defendant's child in foster care had greatly upset the defendant, and that the defendant had offered to assist the victim in securing the return of her children but the victim had rejected his overtures. Further testimony revealed that the victim was a chronic drug and alcohol abuser, and that the defendant feared that her conduct eventually would result in harm to her children. Borden also testified that the defendant had attempted to avoid contact with the victim following her arrest because he feared that he might injure her. The victim, however, had initiated contact on several occasions, regularly appearing at his apartment to ask for money. There was other testimony that the victim had irritated the defendant by, among

---

[17] On May 3, 1991, the victim was arrested and charged with two counts of risk of injury to a minor, one count of breach of peace and one count of assault in the third degree. As a result of this arrest, two of the victim's children, including the defendant's daughter, were placed in the custody of the department of children and families.

other things, throwing stones at his window on several occasions.

There was other evidence adduced at trial, however, from which the court could have concluded that the defendant was not in the throes of an extreme emotional disturbance when he attacked the victim. For instance, before he left his apartment with his machete to look for the victim he had placed two telephone calls to the police and had asked for a specific police officer. In approaching the victim, the defendant had attempted to conceal his weapon. He had appeared calm when he had confronted the victim and inflicted the fatal blows. After he had attacked the victim initially, the defendant was sufficiently in control to break off the assault before returning and killing her. He had previously threatened the victim. He had told the victim while assaulting her that it was time for her to die. He did not ignore a witness who had implored him to cease his attack on the victim, but, instead, had threatened to attack the witness. He and the victim had fought often, without fatal results. Lastly, he had bolted the rear door of his apartment building upon seeing a police officer.

In order to prevail on his defense of extreme emotional disturbance, it was the defendant's burden to prove by a preponderance of the evidence that he had been subjected to an extremely unusual and overwhelming state so that his self-control was overborne by feelings that were extreme "to the greatest degree of intensity away from the norm for that individual." *State* v. *Elliott*, 177 Conn. 1, 10, 411 A.2d 3 (1979). We cannot say that the trial court in weighing and assessing the evidence reasonably could not have concluded that the defendant had failed to meet his burden.

### III

The defendant also argues that, by making mental disease or defect an affirmative defense as to which

the defendant bears the burden of proof, § 53a-13 (a) violates the due process clauses of article first, §§ 8 and 9, of the Connecticut constitution.[18] In *State* v. *Joyner*, 225 Conn. 450, 464, 625 A.2d 791 (1993), we rejected an identical challenge to § 53a-13 (a), concluding that sanity is "not an element of any existing criminal offense" and that § 53a-13 (a) does not violate the due process prohibition against relieving the state of its burden of proving every element of a charged crime beyond a reasonable doubt. We further concluded that "[o]ur state constitution permits the legislature to determine that the defendant, rather than the state, shoulder the burden of proof on sanity when sanity is not an element in the charge against the defendant." Id., 472. The defendant offers no compelling reason to reject our conclusion in *Joyner*, and we decline the invitation to do so.

The judgment is affirmed.

In this opinion PETERS, C. J., NORCOTT and PALMER, Js., concurred.

BERDON, J., dissenting. Although I continue to believe that our statutory law that requires a defendant to bear the burden of proving his insanity defense violates our state constitution; *State* v. *Joyner*, 225 Conn. 450, 483, 625 A.2d 791 (1993) (*Berdon, J.*, dissenting); the defendant in this case has clearly proven by a preponderance of the evidence[1] that, due to mental disease

---

[18] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[1] Even under General Statutes § 53a-12 (b), the defense of insanity need only be proven by a preponderance of the evidence ("[w]hen a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the

or defect, he did not have the requisite mental capacity to be criminally liable for his actions. Solely on the basis of the facts recited by the majority, I would find that, as a matter of law, the defendant was legally insane. As Justice Felix Frankfurter once observed: "[T]here comes a point where this Court should not be ignorant as judges of what we know as men [and women]." *Watts* v. *Indiana,* 338 U.S. 49, 52, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949).

In addition to the undisputed irrational conduct of the defendant prior to and during the attacks on the victim, which is set forth in the majority opinion, the trial court had before it the undisputed testimony of Walter Borden, a forensic psychiatrist, and Julia Ramos Grenier, a clinical psychologist. Borden clinically diagnosed the defendant as suffering from psychotic depression with a borderline personality disorder and depressive features. In other words, the defendant was diagnosed as being a "very confused [and] disturbed person who has poor behavioral controls and [who] tends to be vulnerable to periods of psychosis, [i.e.,] periods of explosive behavior." Borden indicated that the defendant's messages on the 911 police emergency telephone line were further evidence that he "was experiencing an increasing loss of control, that he did not want to cause harm, [that] he did not want to harm [the victim], but that he was losing control and was being overwhelmed . . . ." That loss of control was, in part, precipitated by the victim being charged with risk of injury to the defendant's minor child that resulted

evidence"). As a reminder, proof by a preponderance of the evidence is satisfied if the evidence, considered fairly and impartially, induces in the mind of the trier a reasonable belief that it is "more probable than otherwise" that the issue or fact is true. *Busker* v. *United Illuminating Co.*, 156 Conn. 456, 458, 242 A.2d 708 (1968). "It [is] not necessary that the . . . proof . . . negate all possible circumstances . . . [n]or [is] it necessary that the proof rise to that degree of certainty which excludes every reasonable conclusion . . . ." *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 318, 240 A.2d 881 (1968).

in the child being placed in the custody of the state department of children and families.

Indeed, the evidence indicated that the defendant repeatedly pleaded for help from the police before he killed the victim. Immediately prior to the incident, the defendant called 911 requesting Officer Juan A. Morales of the Hartford police department, with whom he had previously spoken, to intervene. The defendant desperately pleaded: "Because I need him. This girl came here right now and broke everything here and threw the milk, the window, the door and poured the milk—a whole gallon of milk. I don't want to do anything. I was there yesterday. Remember I went yesterday? . . . Now she's up front screwing up my life here. If something happens, you know what's going on. . . . Please do something. . . . I don't want to do anything!"

Grenier also testified that the defendant was mentally ill and diagnosed him as suffering from several mental diseases and defects: organic mood syndrome, organic anxiety syndrome, polysubstance abuse and organic personality disorder, an explosive type. Grenier was convinced that the defendant's loss of control was linked to brain impairment.

Confronted with the testimony of these two expert witnesses, the state chose not to present a scintilla of evidence in rebuttal. This tactic was employed probably because the state could not find a credible psychiatrist or psychologist to refute Borden's and Grenier's testimony. Rather, the state relied solely on cross-examination. Although cross-examination is a means by which expert testimony may be discredited, the majority points to nothing in the prosecutor's cross-examination that would undermine the testimony of these prominent mental health professionals.[2] In fact, the majority conve-

[2] The majority seems to place some importance on the fact that Borden, in a report he had prepared in 1982 for the defendant's trial for the murder of his brother and sister-in-law, did not indicate that the defendant had

niently places its brief discussion of Grenier's uncontroverted testimony relative to her diagnosis in a footnote.[3] Furthermore, the majority emphasizes the fact that the defendant suffered from substance abuse, yet fails to mention that Borden opined that the defendant probably would have killed the victim that day, regardless of any drugs or alcohol he had ingested, because the defendant's controls were overwhelmed even without the substance abuse. Finally, the trial court's specific findings regarding the defendant's intent underscore his insanity.[4]

Although the trier's findings of fact are to be given deference, we cannot abdicate our responsibility to do justice. As stated by Chief Judge Jon O. Newman of the United States Second Circuit Court of Appeals, the province of the fact finder "is not a fortress that can never be entered [by an appellate court], nor is it a black box into which we dare not look." J. Newman, "Beyond 'Reasonable Doubt,'" 68 N.Y.U. L. Rev. 979, 1002 (1993). This court must consider, as a trial court does in reviewing a jury verdict, whether, based upon all our knowledge as human beings, the decision of the

---

experienced auditory or visual hallucinations. I fail to appreciate, nor does the majority discuss, the importance of this omission.

[3] See footnote 11 of the majority opinion.

[4] The panel of judges found the following: "Corroborative of this intent, as evidenced in a portion of the record, is the following: one, the threats to kill Adelaida Ramos made by the defendant to the victim's mother three weeks prior to [the victim's] death; two, the defendant's pronouncement to the victim moments before her death that it is time for you to die; three, the defendant's threatening remarks to a bystander witness if he interfered; four, the cuffing of the machete in an effort to hide it as he approached the victim; five, striking the victim four or five times with the machete and returning to her as she sat to cry for help, holding the hair of her head in his left hand and methodically applying the lethal blows with his right hand; six, after the killing the defendant returned to his apartment, upon seeing Police Officer Daniel Albert approach the rear door of his dwelling he slammed and bolted the door; seven, acknowledging to the Police while being transported to the Police Station that 'I killed that fucking bitch, I killed her with the machete because she took my children away from me.'"

trier of fact is "clearly against the weight of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Hammond*, 221 Conn. 264, 268, 604 A.2d 793 (1992). If it is, that conviction must "be set aside even if the evidence was conflicting and there was direct evidence in favor of" sustaining it. *Palomba* v. *Gray*, 208 Conn. 21, 24, 543 A.2d 1331 (1988). In this case, there is overwhelming evidence that the defendant was unable to control himself due to mental disease or defect and that he was legally insane when he killed the victim.[5]

Accordingly, I dissent.

[5] At the very least, the facts of this case indicate that the defendant acted under extreme emotional disturbance and should have been convicted of manslaughter in the first degree; General Statutes § 53a-55; instead of murder. General Statutes § 53a-54a.