STATE OF CONNECTICUT *v.* COREY QUINET
(SC 16163)

McDonald, C. J., and Palmer, Sullivan, Vertefeuille and Callahan, Js.

Argued December 9, 1999—officially released May 22, 2000*

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Richard F. Jacobson*, special assistant state's attorney, with whom, on the brief, was *Stephen Sedensky*, assistant state's attorney, for the appellee (state).

*Raymond H. Brescia* and *Heather Barr*, pro hac vice, filed a brief for the Mental Health Project of the Urban Justice Center as amicus curiae.

*Opinion*

PALMER, J. After a trial to the court, the defendant, Corey Quinet, was convicted of two counts of attempted murder in violation of General Statutes §§ 53a-54a (a)[1]

---

\* May 22, 2000, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

and 53a-49 (a) (2),[2] and one count of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a) (1)[3] and 53a-49 (a) (2). On appeal,[4] the defendant claims that the trial court improperly: (1) rejected his affirmative defense of insanity[5] under General Statutes § 53a-13;[6] and (2) concluded that Public Acts 1995, No. 95-142, § 2 (P.A. 95-142), which amended General Statutes (Rev. to 1995) § 53a-29 (e)[7] by changing the duration of the potential probationary

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] General Statutes § 53a-13, the provision setting forth the parameters of the insanity defense, does not mention the term "insanity"; rather, it refers to a defendant's *mental disease or defect*. For convenience, we use the terms insanity and mental disease or defect interchangeably throughout this opinion. No distinction between those two terms is intended.

[6] General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . ."

Although the legislature made amendments to § 53a-13 in 1995; see Public Acts 1995, No. 95-264, § 64; those amendments are not relevant to this appeal. For convenience, we refer to the current revision of § 53a-13 throughout this opinion.

General Statutes § 53a-12 (b) provides that a defendant has the burden of establishing an affirmative defense by a preponderance of the evidence.

[7] Although the relevant offense and events leading up to the commission of that offense in this case occurred in April and May of 1994, prior to the publication of the 1995 revision of the General Statutes, the text in General

term for certain convictions of, inter alia, first degree sexual assault,[8] does not apply retroactively to the defendant's conviction for that offense. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The evidence adduced at trial revealed the following undisputed facts. On Friday, April 29, 1994, the defen-

Statutes (Rev. to 1995) § 53a-29 is identical to the text of the version of § 53a-29 applicable in April and May of 1994. See General Statutes (Rev. to 1993) § 53a-29, as amended by Public Acts 1993, No. 93-340, § 12. For ease of reference, all references to § 53a-29 throughout this opinion, unless otherwise provided, are to the 1995 revision.

[8] General Statutes (Rev. to 1995) § 53a-29, as amended by Public Acts 1995, No. 95-142, § 2, provides in relevant part: "Probation and conditional discharge: Criteria; periods. (a) The court may sentence a person to a period of probation upon conviction of any crime, other than a class A felony, if it is of the opinion that: (1) Present or extended institutional confinement of the defendant is not necessary for the protection of the public; (2) the defendant is in need of guidance, training or assistance which, in his case, can be effectively administered through probation supervision; and (3) such disposition is not inconsistent with the ends of justice.

\* \* \*

"(d) The period of probation or conditional discharge, unless terminated sooner as provided in section 53a-32 or 53a-33, shall be as follows: (1) For a felony, except as provided in subsection (e) of this section, not more than five years; (2) for a class A misdemeanor, not more than three years; (3) for a class B misdemeanor, not more than two years; (4) for a class C misdemeanor, not more than one year; and (5) for an unclassified misdemeanor, not more than one year if the authorized sentence of imprisonment is three months or less, or not more than two years if the authorized sentence of imprisonment is in excess of three months, or where the defendant is charged with failure to provide subsistence for dependents, a determinate or indeterminate period.

"(e) *The period of probation, unless terminated sooner as provided in section 53a-32, shall be not less than ten years nor more than thirty-five years for conviction of a violation of* subdivision (2) of section 53-21, *section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b.*" (Emphasis added.)

Prior to P.A. 95-142, § 2, subsection (e) of § 53a-29 provided: "The period of probation, unless terminated sooner as provided in section 53a-22 or 53a-33, shall be not more than thirty-five years for a conviction of a violation of section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b where (1) the conviction is of a second or subsequent violation of any of said sections or (2) at the time of the offense, the defendant was eighteen years of age or older and the victim was under thirteen years of age."

dant, a 1993 graduate of the Hopkins School (Hopkins) in New Haven,[9] conceived a plan to rape and murder twenty-seven of his former female classmates and, thereafter, to flee to Australia, where he intended to commit suicide.[10] One of these former classmates, hereinafter referred to as the victim, was a seventeen year old senior at Hopkins with whom the defendant was acquainted[11] and who once had rejected the defendant's request for a date. The defendant decided that she would be his first victim.

On Saturday, April 30, 1994, the defendant purchased a number of items that he intended to use to rape, torture and murder the victim, including a knife, a glue gun, duct tape, rope, and metal and bamboo skewers. On Monday, May 2, the defendant rented three films containing graphic violence to "get [himself] in the mood" to rape and kill the victim that day.[12]

At approximately 5 p.m. on May 2, the defendant drove to the vicinity of the victim's home and observed the residence from a distance. The defendant did not approach the home immediately because he believed that a car parked in the driveway belonged to the victim's brother and, in addition, because he was not certain that the victim was inside. At about 7:15 p.m., the defendant drove to a nearby pay telephone and called the victim to determine whether she was home. Upon learning that the victim was there,[13] the defendant drove back to the victim's home, walked up to the front door and rang the doorbell. The victim's father answered

[9] Hopkins is a private, coeducational school.

[10] The defendant was nineteen years old when he devised this plan.

[11] The defendant and the victim had worked on the school newspaper together and had attended several of the same classes.

[12] These videotapes are entitled "Faces of Death," "Death Faces," and "Slaughter High."

[13] The victim answered the telephone, and the defendant, who did not identify himself, asked if she was there. The victim identified herself and the defendant immediately hung up.

the door, and the defendant explained that his car had broken down and asked the victim's father if he could use a telephone to call for assistance.[14] The victim's father agreed and, when the defendant entered the house, she recognized him as a former classmate who had graduated from Hopkins the previous year.

The defendant then pretended to use the telephone to call for assistance. The victim's father offered the defendant some food and a drink, which the defendant accepted. The defendant and the victim then engaged in conversation.

The defendant had been at the victim's home for approximately one-half hour when he suddenly pulled out a gun[15] and placed it against the victim's head. The defendant ordered the victim to lie on the floor and, when the victim's father walked into the room, demanded that he do the same. Both the victim and her father complied with the defendant's command. As the defendant was removing some duct tape from a duffel bag[16] that he had brought with him into the victim's home, the victim's father jumped up from the floor, wrested the gun from the defendant and subdued him. The victim's father then ordered the defendant to lie facedown on the floor and the defendant complied.

---

[14] The defendant told the victim that he had been visiting someone in the area when his car broke down.

[15] It subsequently was determined that the weapon was an unloaded pellet gun.

[16] The duffel bag also contained some torn sheets, two packages of metal skewers, two packages of bamboo skewers, moisturizing cream, a glue gun, two glue sticks, two rolls of duct tape, lubricating lotion, rope and a knife with an eight inch blade. The defendant told the police that he had purchased the items and had brought them with him to the victim's home to use in the rape, torture and murder of the victim. In particular, the defendant stated that he intended to use the knife, rather than a gun, to kill the victim in order to inflict more pain. The defendant further explained that, after raping the victim, he had planned to insert the skewers and the glue into the victim's vagina to cause her additional pain and suffering.

The defendant remained in that position, motionless and silent, until the police arrived.

After the police had advised the defendant of his rights, he readily admitted that his purpose in going to the victim's home was to torture, rape and kill her. He further stated that he intended to kill the victim's father and her brother, who also were home at the time,[17] because they would have been able to identify the defendant as the victim's assailant.[18] The defendant also confessed that he had planned to rape and murder twenty-six other female students at Hopkins. Additional facts will be set forth as necessary.

The defendant was charged with three counts of attempted murder for allegedly attempting to kill the victim, her father and her brother, two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2),[19] for allegedly abducting the victim and her father and restraining them with the intent to sexually assault the victim, and one count of attempted sexual assault in the first degree for allegedly attempting to compel the victim to engage in sexual

[17] Although the victim's brother was home, he was upstairs when the defendant pulled out his gun and directed the victim and her father to lie on the floor. He did not come downstairs until after the victim had been disarmed and subdued.

[18] Upon obtaining a search warrant for the defendant's car, the police seized several items therefrom, including a 1992–93 Hopkins student handbook containing a list of the home telephone numbers and addresses of Hopkins students and faculty, a Hopkins yearbook, a calendar book, assorted road maps and a road atlas, the defendant's passport, a plastic gun, a hatchet, plastic packaging for a glue gun, a bed sheet cut into strips, and a laptop computer. The defendant's mother, with whom the defendant resided, consented to a search of the defendant's room. The police seized a number of items from that room, including the three videotapes that the defendant had rented. See footnote 12 of this opinion and accompanying text.

[19] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony . . . ."

intercourse with him by the use or threat of use of force. The defendant, who elected to be tried by the court, raised the affirmative defense of insanity. At the conclusion of the trial, the court rejected the defendant's insanity defense and found him guilty of two counts of attempted murder and one count of attempted sexual assault in the first degree.[20] The trial court rendered judgment sentencing the defendant to a total effective term of imprisonment of forty years, suspended after twenty years, and five years probation. This appeal followed.

I

The defendant first contends that the evidence he adduced at trial established, as a matter of law, that, due to a mental disease or defect, he lacked substantial capacity to control his conduct within the requirements of the law.[21] See General Statutes § 53a-13; footnote 6 of this opinion. We reject the defendant's claim.

The following additional facts are relevant to our resolution of this issue. At trial, the defendant did not deny committing the acts alleged by the state. He claimed, rather, that, as a result of his mental disease or defect, he was unable to conform his conduct to the requirements of the law when he engaged in the proscribed conduct. In support of his affirmative defense, the defendant presented the testimony of

[20] The court, which, on May 4, 1995, announced its verdict in open court, found the defendant guilty of one count of attempting to murder the victim and one count of attempting to murder her father. The court found the defendant not guilty of attempting to murder the victim's brother. The court also found the defendant not guilty of the first degree kidnapping charges.

[21] The defendant never has claimed that he lacked the capacity to appreciate the wrongfulness of his conduct on May 2, 1994. Indeed, on appeal, the defendant concedes that he understood the wrongfulness of his actions. Thus, he makes no claim under the cognitive prong of the insanity defense; his claim is limited to the volitional prong of that test. See General Statutes § 53a-13. See generally *State* v. *Wilson*, 242 Conn. 605, 612–13, 700 A.2d 633 (1997).

Madelene Baranoski, a clinical psychologist, and Paul Amble, a psychiatrist. The defendant also adduced evidence tending to establish that he had suffered from a progressively more serious mental illness that culminated in his unsuccessful effort to rape and kill the victim on May 2, 1994.

Baranoski conducted a psychological evaluation of the defendant that consisted of a number of psychological tests, a clinical interview and a review of the defendant's psychiatric history. On the basis of her inquiry into the defendant's mental condition on May 2, 1994, Baranoski opined that the defendant was suffering from paranoid schizophrenia at that time. Baranoski also stated that the behavior of a person suffering from that mental illness "would be more likely to be impulsive when the disease is not under good control either by medication [or] close psychiatric observation." Baranoski further opined that the defendant "was having difficulty with rational thought" and had "an impairment of judgment and . . . difficulty controlling his behavior" between April 30 and May 2, 1994. According to Baranoski, the defendant also had frequent delusions that an external entity was controlling his mind, another common trait of individuals suffering from paranoid schizophrenia.[22] Finally, Baranoski stated that the ability to plan and organize also was a recognized characteristic associated with paranoid schizophrenia.

Amble conducted a psychiatric examination of the defendant and, in addition, reviewed his mental health history and the results of the psychological tests that Baranoski had administered to the defendant. Amble concluded that the defendant suffered from a "psy-

---

[22] Among other examples of the defendant's delusional ideation, Baranoski testified that the defendant, during a psychiatric hospitalization in the fall of 1993, had stated that an "evil entity" was "controlling his mind by putting in . . . rape fantasies . . . ."

chotic disorder not otherwise specified,"[23] a mental ill-
ness that, according to Amble, is characterized by
bizarre delusions, a separation from reality and a deteri-
oration in functioning. Amble testified that, although
he could not make a definitive diagnosis of paranoid
schizophrenia because, in his view, the defendant's dis-
order was continuing to evolve, his evaluation of the
defendant did "seem to strongly point towards . . .
chronic paranoid schizophrenia." Amble also testified
that the defendant suffered from sexual sadism and,
further, that he did not believe that the defendant was
malingering. Finally, Amble opined that from April 29
through May 2, 1994, the defendant lacked the ability
to control his behavior and that the defendant believed
that he was under the influence of an outside force.

The defendant also adduced evidence regarding his
treatment and hospitalization for mental problems dur-
ing the six month period prior to May 2, 1994. Specifi-
cally, the defendant, while attending Vassar College
(Vassar) in Poughkeepsie, New York, in 1993, after grad-
uating from Hopkins, became obsessed with a young
woman whom he had met at Vassar. The defendant,
distraught because the woman refused his request for
a date, decided to fly to Belgium to commit suicide.[24]
The defendant thereafter aborted the suicide plan.[25] Sev-
eral days later, however, the woman again rejected the
defendant's overture, and the defendant devised a plan
to rape and kill her. The plan failed, and the defendant

---

[23] Amble explained that the term "psychotic disorder not otherwise speci-
fied" refers to a thought disorder, the symptoms of which have not yet fully
expressed themselves. Amble further indicated that he was unable to offer
a more specific diagnosis of the defendant's mental illness because that
illness had not fully manifested itself.

[24] The defendant's father, who had died when the defendant was fifteen
years old, was born in Belgium.

[25] The defendant purchased an airline ticket to Belgium and boarded the
plane, but when the flight was canceled due to a mechanical problem, he
contacted his therapist at Vassar and returned to Poughkeepsie.

was involuntarily committed to St. Francis Hospital (St. Francis) in Poughkeepsie on November 20, 1993.[26]

The defendant was discharged from St. Francis on November 24, 1993,[27] and, on that very same day, was admitted to Silver Hill Hospital (Silver Hill) in New Canaan.[28] The defendant remained there as an inpatient until December 20, when he was discharged to outpatient care. He was readmitted to Silver Hill as an inpatient on December 29, however, because he could not control his suicidal ideation.[29] The defendant was discharged from Silver Hill on January 24, 1994,[30] but, because he still was unable to control his suicidal impulses, he was admitted to Four Winds Hospital (Four Winds) in Katonah, New York, on January 28, where he remained until his discharge on February 22. The defendant continued to receive treatment at Four

[26] The defendant had invited the young woman to a campus classroom, ostensibly to show her a computer program. She arrived, accompanied by a friend, and observed that the defendant was talking to himself and appeared to be confused. The defendant told her that he had a knife in his bag with which he planned to injure her but that he then decided to use on himself. Campus and local police were called, and the defendant was transported to St. Francis. Upon his admission to the hospital, he was diagnosed with major depression and borderline personality disorder.

[27] During his stay at St. Francis, the defendant was treated with antipsychotic medication. Upon his discharge from St. Francis, the defendant was diagnosed with possible schizophreniform reaction and acute paranoid delusional syndrome. According to testimony adduced at trial, the symptoms of schizophreniform and schizophrenia are the same; the two illnesses differ only in that a person suffering from schizophrenia generally must have demonstrated those symptoms for more than six months, whereas a person with schizophreniform will have demonstrated the same or similar symptoms for six months or less.

[28] Upon his admission to Silver Hill, the defendant was diagnosed with a "psychotic disorder not otherwise specified."

[29] The defendant was diagnosed as suffering from depressive disorder upon his readmission to Silver Hill.

[30] While an inpatient at Silver Hill, the defendant told hospital personnel that he frequently had fantasies about raping and killing women, particularly those who had rebuffed him, and that he believed that those fantasies were the result of an "evil entity" that controlled his mind. Upon his discharge from Silver Hill, the defendant was diagnosed with schizophreniform disorder.

Winds on an outpatient basis until March 11,[31] when he entered an outpatient program at Greenwich Hospital. The defendant remained a participant in that program until his arrest on May 2, 1994.[32]

In rebuttal to the defendant's insanity defense, the state relied primarily on its cross-examination of the defendant's two experts, and on the conduct and statements of the defendant before, during and after the events of May 2, 1994. The state also relied on the notes and records of the various institutions at which the defendant had received treatment or counseling, and on the observations of several persons familiar with the defendant's activities and conduct immediately prior to May 2.[33] Finally, the state emphasized the uncontroverted fact that many of the mental health professionals who had examined the defendant offered differing diagnoses of the defendant's psychiatric condition, including the defendant's own experts, Baranoski and Amble.

In particular, Baranoski acknowledged on cross-examination that she did not have enough information to render an opinion as to whether the defendant was unable to control his conduct at any time between April 29 and May 2, 1994. Baranoski also conceded that her diagnosis of the defendant differed from those of a

[31] At Four Winds, the defendant was diagnosed with major depression with a psychotic disorder. Medical personnel noted that he experienced racing thoughts of rape, violence and murder, and that his judgment appeared to be "quite impaired." Nevertheless, as of his discharge date, he was not considered either suicidal or homicidal.

[32] While receiving treatment at Greenwich Hospital, the defendant was diagnosed with bipolar disorder and atypical psychosis.

[33] In its rebuttal case, the state adduced testimony from: June Malone, a clinical psychologist employed by the Bridgeport Community Health Center; Jay Berkowitz, a psychiatrist with the Bridgeport correctional center; Richard Fernandez, a representative of the Caldor department store in Greenwich from which the defendant had purchased many of the items that he planned to use to rape, torture and murder the victim; Kenneth Block and Meegan O'Neil, employees of the Darien YMCA, at which the defendant was employed until his arrest; and Beth Perlman, a therapist at Greenwich Hospital.

number of other mental health professionals, including Amble, and, further, that she disagreed with some of those diagnoses.[34] Finally, Baranoski noted that the defendant had told her that, upon executing his plan to kill twenty-seven people, he would become famous.

Amble stated on cross-examination that he had not previously testified concerning the sanity of a person accused of a crime. Amble further stated that he was not board certified in psychiatry, that, as of the time of trial, he had been engaged in the practice of forensic psychiatry only for about two years, and that he never had treated the defendant. Amble also conceded that he was the only mental health professional to have diagnosed the defendant as suffering from sexual sadism, and that the other examining psychiatrists and psychologists, including Baranoski, had offered diagnoses of the defendant that differed from his own.

In addition, Amble acknowledged that the defendant had felt the need to rent several violent films to "get [himself] in the mood" to rape and kill the victim. Amble also acknowledged that the defendant initially had not planned to kill the victim's father and brother, but later decided to do so, not out of any compulsion to harm them, but because they would have been able to identify him as the victim's assailant. Amble further acknowledged that the defendant originally had planned to kill only himself, but, thereafter, decided that, if he was going to commit suicide, he would fulfill some of his violent sexual fantasies before doing so. Moreover, because the defendant had demonstrated a measure of self-control in executing his criminal plan, Amble could

---

[34] Among the diagnoses with which Baranoski disagreed was that of Jay Berkowitz, a psychiatrist at the Bridgeport correctional center. See footnote 33 of this opinion. Berkowitz testified that in May and June, 1994, he had diagnosed the defendant with bipolar disorder. Berkowitz also testified that, during the course of his limited contact with the defendant, he never had observed the defendant manifest any psychotic behavior.

not say that the defendant would have been compelled to proceed in accordance with his plan if, for example, there had been a law enforcement officer at the victim's home when the defendant arrived there on the evening of May 2, 1994. Amble also conceded that the defendant knew that what he was doing was wrong, and that he was not suffering from any hallucinations, or otherwise out of touch with reality, during the several days leading up to and including May 2. Finally, during closing arguments, the prosecutor noted that Amble agreed that a mental disease or illness can result in a lowering of a person's inhibitions without causing that person to lose control over his or her conduct.

The state also relied on other evidence to support its contention that the defendant was able to control his conduct within the requirements of the law. For example, during several interviews with the police immediately after his arrest, the defendant answered all questions calmly and responsively. In one of these interviews, the defendant, when asked why he had attempted to rape and murder the victim, explained that he "ha[d] the will to do it" and, further, that he "ha[s] a criminal mind."[35]

Subsequent to his arrest, the defendant also told the police that he had rented the three videotapes on May 2 to "expose [himself] to violence" for the purpose of "get[ting] [himself] in the mood" to assault and kill the victim. The defendant further explained that, in light of his previous struggles with such thoughts, it was "time to cross the line." The defendant indicated that he had become impatient waiting to have his first sexual

---

[35] In this interview, the defendant also stated that, if he had been able to execute his plan to rape and murder the victim, he would have felt "[f]ulfilled in a sense. My brain would have been fulfilled because I feel that was what I . . . intended to do. It was intended for me to do that." In addition, the defendant indicated that he had the desire to act out his violent sexual fantasies because, according to him, "nature made my brain a certain way."

relationship with a woman, and that he had "tried to cross the line twice and . . . failed," referring to the incidents involving the victim and the young woman at Vassar.

Finally, the state maintained that Amble's opinion regarding the defendant's inability to control himself lacked support in the evidence. In particular, the state noted that the defendant had exhibited self-control by waiting from Friday until Monday to execute his plan to rape and kill the victim and also noted that the defendant, again, demonstrated self-restraint on Monday by postponing his entry into the victim's home for several hours. In addition, the records of the defendant's treatment at Greenwich Hospital during the period preceding the May 2 incident, and those of the Bridgeport correctional center for the period immediately thereafter, contain nothing to indicate that the defendant believed that he was being controlled by an outside force or forces.[36] Furthermore, the defendant, in responding to a psychological test administered to him while an inpatient at Four Winds in February, 1994, denied that he: was possessed by evil spirits; had very peculiar and strange experiences; has something wrong with his mind; often feels as if things are not real; has ever seen a vision; and wishes that he were not bothered by thoughts about sex. The state also introduced a letter that had been retrieved from the defendant's laptop computer; see footnote 18 of this opinion; in which the defendant, presumably writing to a friend sometime prior to his arrest, indicates that he is doing fine and

---

[36] The records of the Bridgeport correctional center of May 4, 1994, indicate that the defendant apparently had had "occasional auditory hallucinations." Specifically, the defendant believed that he was hearing the voices of guards from the Auschwitz concentration camp, a site that the defendant previously had visited while a student at Hopkins. Amble testified, however, that these voices were "noncommand" in nature, that is, they were not telling or directing the defendant to do anything.

learning to cope with his problems.[37] The state, more-over, adduced evidence indicating that the defendant had been able to sleep and work normally,[38] and enjoy dinner with his friends, in the days immediately prior to May 2.

"It is apparent, therefore, that the [court] reviewed conflicting evidence on the issue of the defendant's mental capacity at the time he [committed the pro-scribed acts]. The evaluation of such conflicting evi-dence on the issue of legal insanity is the province of the finder of fact. . . . [W]e have repeatedly stated that our review of the conclusions of the trier of fact . . . is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact." (Citation omitted; internal quotation marks omitted.) *State* v. *Medina*, 228 Conn. 281, 309, 636 A.2d 351 (1994). Furthermore, "[i]n its consideration of the testimony of an expert witness, the [trier of fact] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an

---

[37] The letter, addressed to "Jay," reads as follows: "Oh boy, does it feel good to be out of the hospital and back home where I can take this opportunity to write you. Things are going just fine here, Jay. I got to tell you I feel like a new man. At my last stay in the hospital I really thought over a lot of things. First, it was a big mistake to call [to apologize to the young woman from Vassar]. I knew I would get in trouble for it and I did but what's done is done and we've got to move on. In group therapy I really opened up and talked about my problems. I talked about the loss of my dad and how I really miss him. It was surprising how well I handled it."

[38] For example, the defendant, who was employed by the Darien YMCA as a swimming instructor and lifeguard until his arrest, worked there on Sunday, May 1, 1994, without incident.

opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them." (Internal quotation marks omitted.) *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996); accord *State* v. *Patterson*, 229 Conn. 328, 339, 641 A.2d 123 (1994). Moreover, "[a]lthough expert witnesses testified on behalf of the defendant and the state called none, that alone is not a sufficient basis to disturb the verdict on appeal . . . for the [trier of fact] can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions." (Citations omitted; internal quotation marks omitted.) *State* v. *Medina*, supra, 309–10. It is the trier of fact's "function to consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances." *State* v. *Evans*, 203 Conn. 212, 242, 523 A.2d 1306 (1987); see also *State* v. *Cobb*, 251 Conn. 285, 490, 743 A.2d 1 (1999) ("the state can weaken the force of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence" [internal quotation marks omitted]).

In light of the totality of the evidence, the court reasonably could have rejected the opinion of Amble, the lone witness to testify that the defendant, due to his mental illness, was unable to control his conduct within the requirements of the law on May 2, 1994. In addition, the court reasonably could have concluded that, even though the evidence indicated that the defendant was suffering from a mental illness,[39] he nevertheless had the capacity to refrain from acting on his desire to commit rape and murder. In particular, that conclusion is supported by the fact that the defendant felt the need

---

[39] In rendering its verdict, the trial court noted that "it is clear that the defendant is a troubled young man who suffers some mental illness."

to "get [himself] in the mood" in advance of attempting to commit those crimes by viewing videotapes depicting graphic violence. That conclusion is further supported by evidence indicating that the defendant decided to act out his sadistic sexual fantasies only after he had resolved to accomplish his primary objective, namely, to kill himself.[40]

The defendant also asserts that the trial court, in rejecting his affirmative defense, placed undue emphasis on the fact that the defendant was able carefully to plan his attack on the victim over a period of several days.[41] In particular, the defendant contends that his

---

[40] The assistant state's attorney made the following remarks regarding this point in his rebuttal closing argument: "As [the defendant] thought about [committing suicide] more and planned it more thoroughly, he had the idea that, if he were going to die anyway, he would fulfill some of his sexual fantasies. The sexual fantasies no longer have to be controlled, because he's not going to be around to be apprehended. That doesn't indicate that he lacks . . . control. It indicates that he doesn't wish to put it off any longer and there's a distinction. His focus is to commit suicide and, as long as he's going to do that, there's no reason to control [himself] any longer with regard to the fantasies."

[41] In support of his claim, the defendant relies on the following portion of the trial court's statement explaining its verdict: "The defendant, by the evidence, the court can so find, carefully planned his course of conduct. He made deliberate preparations to seek out [the victim] and other classmates by use of the Hopkins yearbook and handbook, whereby he obtained their addresses and used maps and atlases to determine their locations. He purchased all of the items he felt he needed to carry out his plan. That includes . . . the rope, the duct tape, skewers, lubricants and, of course, the knife, which he indicated was the intended fatal weapon.

"He prepared an escape plan by making a plane reservation for Australia four days hence. He concocted a ruse . . . to gain entrance to the [the victim's] home. He surveyed that home and made the conscious decision not to immediately go up to the house, because he saw a car and believed that the victim's brother may be at home. He thereupon, called from the railroad station to verify that [the victim] was at home. He proceeded to the house. [He] [e]ntered by deceit and eventually attempted to carry out his planned mayhem, which was thwarted by [the] . . . actions [of the victim's father].

"Surely, one can perceive this type of conduct as unusual and even bizarre, but the court, taking into account the calculated and precise planning and movements of the defendant and his acknowledgement in the statement to

ability to plan cannot be viewed as inconsistent with his claim that, due to the particular nature of his mental illness, he could not control his conduct within the requirements of the law.

Of course, an accused who suffers from a mental disease or illness may be able to establish that he was unable to control his conduct according to law even though he had the capacity to plan that illegal conduct. Whether the capacity to plan a course of criminal conduct is probative of an accused's ability to control his behavior within legal requirements necessarily depends upon the specific facts and circumstances of the case, and ultimately is a determination for the trier of fact. Indeed, we previously have indicated that an accused's ability to formulate a plan to kill is relevant to a determination of whether the accused has the capability of conforming his conduct to the requirements of the law. See *State* v. *Steiger*, 218 Conn. 349, 382, 590 A.2d 408 (1991) (defendant "was in sufficient control of himself to form a plan to kill the victims in order to exact revenge and to make preparations to carry out that plan"). We see no persuasive reason why the court was prohibited from drawing such an inference in this case.

Moreover, although it is true that the trial court underscored the fact that the defendant had "carefully planned his course of conduct," the court did not indicate that it had relied exclusively on such evidence in rejecting the defendant's insanity defense. Thus, we are free to examine the entire record to determine whether

the police that he was a criminal and was escaping to Australia and, [the trial court] quote[s], 'because I wanted to get far away from here, I would be a criminal and I wanted to be as far away as possible from this country,' and also that he would [have killed the victim's father and brother] because, again quot[ing the defendant] 'they would have seen me,' all suggest . . . to the court that the defendant appreciated the wrongfulness of his actions and was able to conform his conduct to the requirements of the law even though he suffered from some mental illness."

a fact finder reasonably could have concluded that the defendant had failed to establish that he lacked substantial capacity to control his desire to commit rape and murder. As we previously have explained, the state mounted a vigorous challenge to the defendant's insanity defense, and adduced considerable evidence, both on cross-examination and in its rebuttal case, to undermine the defendant's claim. Accordingly, we reject the defendant's assertion that the evidence presented in support of his defense was so persuasive as to require a finding that it was more likely than not that he was unable to control his conduct within the requirements of the law. The defendant, therefore, cannot prevail on his claim that he was entitled to a judgment of acquittal as a matter of law.

II

The defendant also claims that the trial court improperly concluded that P.A. 95-142, § 2, which amended § 53-29 (e) to require the imposition of a probationary term of not less than ten years and not more than thirty-five years for certain serious sexual offenses, including first degree sexual assault under § 53a-70; see footnote 8 of this opinion; does not have retrospective applicability to the defendant's conviction of attempted first degree sexual assault. Because we agree with the state that P.A. 95-142, § 2, does not have retroactive effect, we reject the defendant's claim.

A brief review of the pertinent statutory provisions is necessary to our resolution of this claim. Section 53a-29 (a) authorizes a trial court to impose a period of probation for certain felony offenses. Under subsection (d) of § 53a-29, a court may impose a probationary period not to exceed five years for the conviction of any felony, other than a class A felony or an offense enumerated in subsection (e) of § 53a-29, if the court determines that the criteria set forth in subsection (a)

have been met. Prior to October 1, 1995, subsection (e) of § 53a-29 authorized a court to impose a term of probation of up to thirty-five years for a conviction of certain serious sex offenses, including a conviction under § 53a-70, if the person convicted: (1) previously had committed a violation of one of the offenses enumerated in § 53a-29 (e); or (2) was, at the time of the offense, eighteen years of age or older and the victim was under the age of thirteen. See General Statutes (Rev. to 1995) § 53a-29. Because the defendant was a first time offender and the victim was over the age of twelve, § 53a-29 (e) was not applicable to him as of the date of his offense. Consequently, the defendant faced a maximum period of probation of five years.

In 1995, however, the legislature amended § 53a-29 (e) to require that the period of probation imposed for any of the offenses enumerated therein, including § 53a-70, shall be not less than ten years and not more than thirty-five years. The amendment also expanded the group of offenders eligible for the enhanced probationary period of subsection (e) by: (1) eliminating the requirement that the accused previously have been convicted of one of the crimes enumerated therein or be at least eighteen years old and the victim under thirteen years old at the time of the offense; and (2) adding the offense of risk of injury to a child by sexual contact; see General Statutes § 53-21 (2); to the list of offenses enumerated in subsection (e).

Public Act 95-142, § 2, took effect on October 1, 1995, approximately seventeen months after the defendant's attempted sexual assault on the victim, and approximately five months after the defendant's conviction for that offense. At the sentencing hearing, however, the defendant maintained that P.A. 95-142, § 2, had retrospective applicability to his conviction for attempted first degree sexual assault. The defendant claimed, therefore, that the court was not limited to sentencing

the defendant to a maximum probationary term of five years, but, rather, was authorized to impose a term of probation of not less than ten years and not more than thirty-five years. The defendant further claimed that a long prison sentence was not necessary, and urged the court to impose a probationary term of at least ten years in lieu of a lengthy period of incarceration.[42] The state, which had sought a term of imprisonment of forty years, maintained that P.A. 95-142, § 2, was not retroactive and, therefore, that the defendant was eligible to receive a maximum period of probation of only five years. The court rejected the defendant's retroactivity claim and sentenced the defendant in accordance with the version of § 53a-29 existing prior to the 1995 amendment.[43]

On appeal, the defendant renews his contention that the trial court improperly failed to sentence him under the provisions of § 53a-29 (e) as amended by P.A. 95-142, § 2. We disagree.

Whether P.A. 95-142, § 2, is retroactive presents a question of statutory construction. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this

---

[42] The defendant argued that a long period of treatment and counseling, administered under the supervision of the office of adult probation, was a far better sentencing alternative than a protracted prison term.

[43] The defendant sought to waive any claim that he might have had regarding the inapplicability of a longer probationary sentence under P.A. 95-142, § 2. The trial court, however, was not persuaded that any such waiver would be binding on the defendant if it subsequently was determined that the court lacked the authority to impose a probationary term in excess of five years. The trial court also noted that the results of the defendant's psychiatric evaluation, which had been ordered by the court upon the defendant's postconviction motion for an examination under General Statutes § 17a-566, indicated that the defendant was not likely to benefit from treatment. Finally, the trial court stated that a short period of incarceration was unwarranted under the facts and circumstances of the case.

case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . [B]ecause the question presented by this appeal involves an issue of statutory construction, our review is plenary." (Citations omitted; internal quotation marks omitted.) *Schreck* v. *Stamford*, 250 Conn. 592, 596–97, 737 A.2d 916 (1999).

There is nothing in the language or legislative history of P.A. 95-142, § 2, to suggest that the legislature intended for the amendment to be applied retroactively. We will not give retrospective effect to a criminal statute absent a clear legislative expression of such intent. See, e.g., *State* v. *Parra*, 251 Conn. 617, 625–26, 741 A.2d 902 (1999); *In re Daniel H.*, 237 Conn. 364, 376, 678 A.2d 462 (1996); *State* v. *Crowell*, 228 Conn. 393, 401, 636 A.2d 804 (1994).

Furthermore, under § 53a-29 (e), as amended by P.A. 95-142, § 2, a person convicted of first degree sexual assault is subject to a minimum probationary term of ten years and a maximum probationary term of thirty-five years. When the defendant engaged in the conduct that resulted in his conviction for attempted first degree sexual assault, he was subject to a maximum probationary period of only five years. See General Statutes (Rev. to 1995) § 53a-29 (d) and (e). Thus, the retroactive application of P.A. 95-142, § 2, would expose the defendant and all others similarly situated to a substantially longer probationary period than they otherwise could have received for offenses subject to the pre-1995 amendment version of § 53a-29. It, therefore, is highly doubtful that the retrospective application of P.A. 95-142, § 2, would pass muster under the ex post facto clause of

article one, § 10, of the United States constitution,[44] which prohibits the retroactive application of a criminal statute that increases the punishment for a crime after its commission.[45] See, e.g., *Garner* v. *Jones*, 529 U.S. 244, 249–50, 120 S. Ct. 1362, 146 L. Ed. 2d 236 (2000) ("[o]ne function of the Ex Post Facto Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission"). "In choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 493, 680 A.2d 147 (1996); accord *State* v. *Ross*, 230 Conn. 183, 236, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). We, therefore, reject the defendant's

---

[44] The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

[45] The defendant contends that, because the trial court necessarily would have imposed a term of probation greater than five years under § 53a-29 (e), as amended by P.A. 95-142, § 2, the court might have imposed a shorter term of imprisonment than it did. The defendant asserts that, in such circumstances, P.A. 95-142, § 2, reasonably cannot be construed as authorizing an increased penalty for those offenses, including § 53a-70, that fall within the purview of subsection (e) of § 53a-29. We are not persuaded. First, the defendant's argument requires us to speculate as to what sentence the court might have imposed if the court could have imposed a period of probation in excess of five years. In fact, there is nothing in the record to indicate that the defendant would have received a shorter prison term in such circumstances. More importantly, however, P.A. 95-142, § 2, contains no requirement that the enhanced probationary sentence authorized thereunder be imposed in lieu of, and not in addition to, any term of incarceration otherwise authorized for a conviction of one of the offenses enumerated in § 53a-29 (e). In other words, under the amendatory language, the court could impose a significantly longer probationary term without any corresponding reduction in the length of any prison term that the court may impose. We, therefore, disagree with the defendant's contention that P.A. 95-142, § 2, need not be characterized as establishing a greater punishment than previously had been authorized for a violation of the offenses enumerated in § 53a-29 (e).

claim that the trial court improperly refused to give retroactive effect to P.A. 95-142, § 2.[46]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[46] The defendant contends that several cases from other jurisdictions support his claim that P.A. 95-142, § 2, should be applied retroactively. Those cases are inapposite, however, because, in each such case, the statutory amendment either reduced the potential term of imprisonment to which the defendant had been subject at the time of the offense; *In re Estrada*, 63 Cal. 2d 740, 742, 408 P.2d 948, 48 Cal. Rptr. 172 (1965); *State* v. *Wilson*, 279 Mont. 34, 39–40, 926 P.2d 712 (1996); modified an element of the offense with which the defendant was charged such that the statute as amended eliminated the defendant's potential for conviction thereunder; *People* v. *Behlog*, 74 N.Y.2d 237, 240–41, 543 N.E.2d 69, 544 N.Y.S.2d 804 (1989); see also *People* v. *Roberts*, 24 Cal. App. 4th 1462, 1466, 29 Cal. Rptr. 2d 771 (1994) (amendment modifying element of penalty enhancement provision); or expanded the number of alternatives to incarceration that could be employed in sentencing the defendant. *People* v. *Patino*, 174 Misc. 2d 359, 363–65, 664 N.Y.S.2d 406 (1997). In contrast, P.A. 95-142, § 2, significantly enlarged the period of probation to which an eligible offender could be sentenced for a conviction of first degree sexual assault, thereby increasing the punishment for that offense.