[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] CORRECTED MEMORANDUM OF DECISION
Upon consideration of all of the evidence, as well as the credibility of the witnesses, the court finds the following facts and reaches the following conclusions as to the legal claims of the parties.
 FINDINGS OF FACT
1. On January 14, 1996, the defendant intended to assault a person with an axe. He had no particular victim in mind but he had a plan and made CT Page 6132 preparations to achieve his objective.
2. In the basement workshop of his home at 25 Willow Lane in Madison, Connecticut, the defendant sawed off the bottom portion of an axe handle so that he could conceal the top part with the axe head in his backpack.
3. He hid the bottom part in the workshop behind some carpeting where it could not be easily found. It was recovered during the execution of a search warrant on January 17, 1996.
4. Thereafter, the defendant drove to the North Madison Shopping Center on Route 80, Madison. He parked his car and began to walk. He had his knapsack with the axe.
5. Around 7:05 p.m., a passing Madison police officer on routine patrol in a marked cruiser saw the defendant walking toward him on Route 80 away from the shopping center. When the defendant saw the officer he turned aside to hide his face from the officer.
6. The defendant walked for at least half an hour. He was trying to select a house where he could carry out his attack.
7. James Diston, hereinafter the victim, lived with his family at 69 Mendingwall Circle, Madison, Connecticut. The area is rural with woods in back of the houses along the street.
8. The defendant stopped at the Diston residence. As he later told the police, he had a "gut feeling" this was the house.
9. The defendant took his axe and left his backpack on the next door driveway.
10. Around 8:00 to 8:15 p.m., the defendant rang the Diston front doorbell and through the door told the victim that his car had broken down and that his heater was not working. None of this was true. It was a ruse invented by the defendant to gain entry into the Diston residence.
11. As soon as the victim turned the front door deadbolt the defendant slammed the door back and burst inside.
12. The defendant immediately began to attack the victim with his axe. His blows were not struck at random. They were concentrated at the victim's head and torso as if purposely directed.
13. As a result of those blows the victim sustained physical injuries. His arms and stomach were cut. He had a welt on his head. CT Page 6133
14. The defendant and the victim struggled inside the house. The defendant continued to strike at the victim while resisting the victim's effort to eject him.
15. Ultimately the defendant was forced from the house. He fell and lost his baseball cap. He left it.
16. The defendant got up and fled. The victim gave brief chase swearing at the defendant.
17. The Madison police responded within minutes in response to a 911 call from Mrs. Diston while the attack was still in progress.
18. The police searched the immediate area and could not find the defendant.
19. The defendant's backpack ultimately came to the attention of the police. His name was inside. Consequently, the police developed a list of Griffin families living in the area. The defendant's address was on that list.
20. Around 8:40 p.m., Officer Gambardella responded with "Gunner" a canine. Both were trained in scent tracking. Using the defendant's baseball cap as a scent model the police and "Gunner" began to track the route of the defendant's flight from the Diston residence.
21. The route led out of Mendingwall Circle southerly down Summer Hill Road toward Route 80 where the scent was lost in traffic some time around 9 p.m.
22. Early on that route the police noted four or five loops, some twenty to twenty-five feet into the woods and then back, over the snowbanks on the side of Summer Hill Road, where the defendant had left the roadway to kneel or sit. The footprints around these stopping places were similar in size, tread and weight bearing impression to the footprints the defendant had left near his baseball cap in front of the Diston residence.
23. On January 14, 1996, around 8:00 p.m. a passing motorist saw the defendant walking on Summer Hill Road. He was carrying a red axe. As the motorist passed the defendant shielded the axe from view.
24. On January 16, 1996, the defendant's axe was found where he had thrown it into the woods off Summer Hill Road along the route he had taken in flight from the Diston residence. CT Page 6134
25. On the afternoon of January 14, 1996, around four or five o'clock, the defendant's mother telephoned him at home to tell him that his sister had broken her wrist. He sounded normal to his mother. She thought he was fine. He teased his sister about her wrist. His mother and sister were away on a ski trip.
26. Sometime after the attack later that evening, after the police had gotten the defendant's address, the police went to 25 Willow Lane. The defendant was not home.
27. Around 9:00 p.m., still on January 14, 1996, the defendant arrived at the house of Laura Gibson, his aunt. By brisk walk her home was some thirty one minutes south of the Diston residence on the other side of Route 80. The defendant seemed fine to her. She noticed nothing unusual about his behavior. He asked her for a ride to his car at the shopping center. He lied telling her his car had broken down. She drove him to his car.
28. On the following day, January 15, 1996, on follow-up investigation, the Madison police returned to the defendant's home. There was a vehicle parked in front and the interior house lights were on. There was no response from inside. The entrance was dead bolted from the inside. After gaining permission from family members the police entered.
29. While searching the second floor an officer noticed a closed door with a rectangular box leaning against it creating the deliberate impression that no one was behind the door. He opened the door. It was a closet. The defendant was hunkered down on the floor with a knife in his right hand.
30. Without more the officer slammed the door and ordered the defendant out. He did not respond.
31. Other officers arrived and they opened the closet door. The defendant put the knife to his other wrist. There was a struggle and the knife was taken from him. The defendant still refused to leave the closet. The officers tried to defuse the situation.
32. The officers tried to coax the defendant out of the closet. They told him they were there to help him and not to arrest him. Without any police prompting, the defendant replied, "No. You're here because of the guy I tried to kill with an axe." The police had not mentioned this to him.
33. The defendant volunteered further statements to the officers at CT Page 6135 this time. He told them that he had cut down an axe so it would fit into his backpack, that he had driven to the North Madison Shopping Center where he had parked and started to walk and that he had stopped at the Diston residence because he had a gut feeling.
34. The defendant further stated that he was depressed in part because he should have done a better job in trying to kill the victim. He wished he had chosen a better weapon because he wasn't able to kill the victim.
35. The defendant told the police he had returned home after the attack and attempted suicide by ingesting pills. He had prepared a suicide note which one of his grandparents found and turned over to the police.
The note stated "I don't know how to explain what I did or why I did it, but I am sorry. After my death I would like myself exaimed [sic] if possible to see if there was anything physcal [sic] or chemical that may have caused me to do something like this."
36. During the entire time the defendant remained in the closet, some forty-five minutes, while he appeared nervous and afraid he was nevertheless not confused about where he was or what was happening around him. He was alert, oriented and fully awake.
37. Although at times suicidal and emotional, the defendant responded appropriately to what the officers said to him. He showed no difficulty in understanding them and his responses to them were equally clear.
38. Laura Gibson, the defendant's aunt, came into the room but could not get him to leave the closet.
39. The defendant refused to come out even after he was told pepper spray would be used on him if he did not. The police explained how it would sting his eyes. He understood but still refused. He tried to cover his eyes when it was ultimately used as he was forcibly removed from the closet.
40. Upon his removal the defendant was admitted to the psychiatric ward at the Hospital of Saint Raphael, New Haven, Connecticut for his own safety and that of others. He remained as a patient for over a month.
41. Susan Dunigan was the defendant's primary care nurse at Saint Raphaels. During his stay he made multiple admissions to her.
42. On January 21, 1996, he told her that "I wish I had sharpened the axe." When asked why, he said, "then no one would be able to say it was me and I wouldn't be here." CT Page 6136
He said he was sorry he wasn't eighteen years old so he could have bought a gun to shoot the person he had assaulted.
43. On February 4, 1996, in discussing the legal challenges that faced him upon discharge the defendant told her that he had made errors and he described the ways in which he would or should have committed the assault on Diston differently. "I would probably have used a knife instead of an axe." "I would seek some place closer." "I wouldn't leave my name there." "I'd make sure I could kill myself after it." He continued to say that if he is sentenced to jail he will kill himself.
44. The defendant's usual statement to her concerning Devereaux, a residential school for adolescents with mental problems, into which his admission was being processed, was that "it's better than jail."
 CONCLUSIONS
45. The outcome of the issue as to the defendant's mental state at the time of the crimes charged depends upon the facts and circumstances of this particular case and is ultimately a determination for the trier of fact, here, the court, who can disbelieve any or all of the evidence on insanity and can construe the evidence in a manner different from the parties' assertions. State v. Quinet, 253 Conn. 392, 408 (2000).
46. The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. In its consideration of the testimony of an expert witness, the court might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. State v. DeJesus, 236 Conn. 189, 201 (1996).
47. The court has performed its fact finding function in accordance with the foregoing analyses. It has reviewed the totality of the evidence. It has observed the demeanor of all the witnesses, experts or otherwise, on both direct and cross-examination. It has reviewed the foundations for the opinions and conclusions of each expert.
The court concludes that the defendant has failed to prove by a preponderance of the evidence that at the time of the crimes charged he lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. CT Page 6137
In so finding the court has not required the defendant to prove the etiology of any claimed mental disease or defect.
48. The parties offered diametrically opposed experts on the issue of insanity. The court found Doctors Joseph Penn and Eugene Shapiro, offered by the state, to be more credible than the defendant's experts. The testimony of Doctors Penn and Shapiro had a more comprehensive foundation in both fact and preparation, was more objective and less speculative, had a stronger clinical and empirical basis, was better reasoned and therefore more persuasive in the perception of the court as finder of fact.
49. In reaching their conclusions Doctors Penn and Shapiro relied upon a number of critical factors which should have been considered in determining the defendant's mental state at the time of the crimes charged. These include:
a) The defendant's premeditated and purposeful conduct in preparing for his attack, carrying it out and in his efforts to avoid detection or apprehension once it concluded.
b) The defendant's ability to organize his thinking and function normally before and after the attack.
c) The absence of any evidence that the defendant had any break with reality.
d) The defendant seemed normal to his cousin, mother and aunt either during the afternoon hours before the attack or just shortly after it.
e) A psychotic episode gradually begins and ends over time with advance and residual symptoms. There were none of significance here.
t) The defendant's conduct and statements vis a vis the police and his primary care nurse demonstrating his vivid awareness of what he had done and the wrongfulness of it.
g) The defendant's selective amnesia in interaction with his experts in contradiction to the recall he showed in his statements to the police and at Saint Raphaels.
h) The reliance of defense experts at least in part on the self serving statements of the defendant or his family.
i) The defendant met the diagnostic criteria for malingering. CT Page 6138
j) The lack of meaningful evidence of psychosis generally in the defendant's entire history, medical or otherwise and specifically in the records and notes of the Hospital of Saint Raphael.
k) The absence of subsequent psychotic episodes.
l) The absence of mental deterioration.
m) The unlikelihood of an adverse reaction to medication.
n) The extensive negative test results for Lyme disease from several types of tests and from several different laboratories.
50. Moreover, the court has considered the following additional factors in assessing the credibility of the defense experts.
a) Dr. Zanker believed the negative Lyme disease tests performed at Saint Raphaels were credible.
b) Contrary to what he told Dr. Jones, the defendant had no difficulty reading regularly on an adult level at Saint Raphaels.
c) Although the defendant told Dr. Zanker he had been suicidal for years, he never mentioned this to Dr. Schwartz whom he had been seeing since 1994.
d) The defendant had stated during his stay at Saint Raphaels that he preferred psychiatric placement to jail.
e) Dr. Charles Jones made his initial diagnosis of Lyme disease without the benefit of seeing the defendant upon the basis of a telephone conversation with the defendant's mother who reported the defendant's alleged symptoms to the doctor.
f) Dr. Robert Bransfield first saw the defendant in June, 1996. He was not a treating physician.
g) Dr. Dan Connor's May 24, 1996 report from Devereaux states that the staff did not find the defendant to be psychotic.
h) The June 19, 1999 report from Dr. Timothy Vollmer, concluding that neither the patient's history, laboratory testing or neurologic examination supports a diagnosis of . . . Lyme disease or . . . seizure to explain the defendant's alleged behavior is strongly corrobative of the other evidence presented by the state negating the defense of insanity. CT Page 6139
i) Dr. Madelon Baranoski offered no opinion on the defendant's mental state on January 14, 1996.
j) The defendant's suicidal ideation including his note and in his conduct when discovered by the police including his dogged resistance to leave the closet all demonstrate the defendant was fully aware of what he had done and that it was wrong.
51. The defendant's experts, either individually or collectively failed to adequately respond to or even address the factors set fort in paragraphs forty-nine and fifty.
52. The court finds that although the defendant's conduct was strange and unexpected, at the time of the crimes charged, his conduct was fully voluntary, intentional, he was aware of his conduct, he appreciated the wrongfulness of his conduct and he was able to control his conduct within the requirements of the law even though he suffered from some mental illness.
53. Upon the evidence the state has proven beyond a reasonable doubt all the elements of the crime of burglary in the first degree charged under the first count as follows:
a) The defendant knowingly and unlawfully entered or remained in the Diston residence.
His entry or remaining was knowing in that it was deliberate and not by accident or inadvertence.
His entry or remaining was unlawful in that at the time of such entry or remaining the Diston residence was not open to the public and the defendant was not otherwise licensed or privileged to do so particularly in light of his intended purpose once inside.
Moreover, he remained therein without the consent of the victim once he began his attack and resisted the victim's effort to eject him.
b) The Diston residence was a building with § 53a-100 (a)(1) of the penal code.
c) The defendant entered the Diston residence with the intent to commit the crime of assault therein.
d) In the course of such burglary and assault the defendant was armed with an axe which under the circumstances constituted a dangerous instrument within § 53a-3(7) of the penal code. CT Page 6140
54. Upon the evidence the state has proven beyond a reasonable doubt all of the elements of the crime of criminal attempt to commit assault in the first degree charged under the second count as follows:
a) As inferred from the type of weapon used, the manner in which it was used, the type and number of wounds inflicted and the events leading to and following the use of that weapon, the defendant had the intent to cause the victim either serious and permanent disfigurement or to destroy, amputate or disable permanently a member or organ of the victim's body.
While there is in the evidence, particularly in the defendant's statements to the police and his primary care nurse, some evidence that the defendant intended to kill his victim, under the circumstances, such intent is not in conflict with the intent required for commission of the assault charged in the second count. Such intents may be simultaneously held and demonstrated by the same conduct. State v. Williams,237 Conn. 748, 757 (1996).
b) Acting with the aforesaid intent to disfigure or to destroy or to amputate or to disable the defendant intentionally acted to carry out that intent by gaining entry to the victim's residence and commencing his attack upon him.
c) Such conduct, under the circumstances as the defendant believed them to be, was a substantial step in a course of conduct which the defendant planned to end in his commission of the crime of assault in the first degree as charged in the second count.
55. In accordance with all of the foregoing, this court finds the defendant guilty as charged in both the first and second counts.
56. Accordingly, the court need not address lesser included offenses.
Licari, J.